ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Targe Logistic Services Company | )     ASBCA No. 63282 |
| | ) |
| Under Contract Nos. W91B4N-18-D-2005 | ) |
|            W91B4N-19-D-0005 | |
|            W91B4N-19-D-0006 | |
|            W91B4N-19-D-0008 | |
|            W91B4N-19-D-0009 | |
|            W91B4N-19-D-0010 | |

APPEARANCES FOR THE APPELLANT:        Enayat Qasimi, Esq.
                                               Shamsi Maqsoudi, Esq.
                                                Whiteford, Taylor & Preston LLP
                                                Washington, DC

APPEARANCES FOR THE GOVERNMENT:      Dana J. Chase, Esq.
                                               Army Chief Trial Attorney
                                               Major Brandon P. Mark, JA
                                               Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE TAYLOR
ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND
APPELLANT'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

      This appeal involves a claim by Targe Logistic Services Company (TLS or appellant) for the loss of fuel, delivery equipment, and other assets due to the collapse of the Government of Islamic Republic of Afghanistan (GIRoA) following the takeover of the country by the Islamic Emirate of Afghanistan (known as the Taliban). TLS contends the United States Army (Army or government) is responsible for its alleged losses because the Army breached several contracts by failing to pay for delivered and stored fuel (Count I), provide security and access to the facilities (Count II), breached the covenant of good faith and fair dealing (Count III) and constructively changed the contracts (Count V). The government filed a motion for summary judgment contending it is entitled to judgment on this appeal as a matter of law on those counts since the undisputed facts show that it did not breach or constructively change the contracts. Moreover, the government asserts the Board should grant its motion based upon the affirmative defenses of sovereign acts, third-party actions, assumption of risk and the unambiguous contract terms.

TLS contends disputed material facts exist that prevent the Board from granting the Army's summary judgment motion. In addition, TLS filed a cross-motion for partial summary judgment asserting an entitlement to payment for the fuel stored at the various facilities and terminals under the commercial termination for convenience clause since the contracts included a minimum fuel requirement (Count IV). The Army responded to TLS's cross-motion contending it is not required to pay for that fuel since the Taliban confiscated the fuel before the termination for convenience occurred and the contracts placed the risk of loss on TLS.

For the reasons discussed below, we grant the government's motion for summary judgment and deny TLS's partial cross-motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

The Contracts

1. The Army awarded Contract Nos. W91B4N18D2005, W91B4N19D0005, W91B4N19D0006, W91B4N19D0008, W91B4N19D0009 and W91B4N19D0010 (the contracts) to TLS beginning on October 10, 2018 (R4, tabs 1-6).

2. The contracts were indefinite-delivery, indefinite-quantity (IDIQ) contracts for the supply and delivery of aviation turbine fuel to Afghan National Defense and Security Forces (ANDSF) sites throughout Afghanistan (R4, tab 1 at 28).[1] The contracts required TLS to "provide all personnel, equipment (i.e., required vehicles), supplies, transportation, tools, materials, supervision, other items, and other ancillary non-personal services necessary to deliver" the aviation fuel (*id*. at 28). The fuel was to be delivered by "mobile cold fueling" into designated Afghan Air Force (AAF) and Special Mission Wing (SMW) aircraft (*id.*) Mobile cold fueling was defined as "the mobile fueling (by truck) of static aircraft with engines not running," and is also known as "direct to tail" fueling (*id*.). The contracts further required TLS to deliver the fuel on a "Free on Board (FOB) Destination Basis" and to maintain an effective supply chain to ensure an uninterrupted fuel supply (*id*. at 28-29). The contractor was responsible for "all aspects of supply chain management, from acquisition of the aviation fuel from refineries or pipeline terminals . . . and delivery into aircraft refueling vehicles at the AAF and SMW locations (*id*. at 29)." The contracts priced the fuel by the liter (*id*. at 3).

---

[1] All six contracts have similar language. For ease of reference, we cite only to Contract No. W91B4N18D2005. We also note the government's Rule 4 file is Bates numbered with a six-digit number preceded by "Army." Here, we delete the prefix and the leading zeros.

3.  The contracts incorporated by reference FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JAN 2017), which reads in pertinent part:

> (l)  Termination for the Government's convenience.  The Government reserves the right to terminate this contract, or any part hereof for its sole convenience.  In the event of such termination . . . [Prong 1] the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus [Prong 2] reasonable charges the Contractor can demonstrate . . . have resulted from the termination.

(*Id*. at 8).  The contracts also required TLS to "comply with all applicable updated/superseded regulations, publications, manuals, and local policies and procedures identified in this SOW . . . that are incorporated into the resulting contract" (*id*. at 29).

Acceptance and Payment

4.  The contract's SOW, Section 6.14, Acceptance, provided:

> Until acceptance, risk of loss or damage shall remain with the Contractor.  The ANDSF delivery receiving activity shall provide written acceptance of the fuel on the delivery ticket, by certifying the delivery and signing the delivery ticket to affirm the amount of fuel actually delivered. . . . Upon signature by the ANDSF delivery activity, the fuel is accepted, in the amount identified on the delivery ticket.

(*Id*. at 35)

5.  The contract's SOW, Section 6.15, Invoicing, required the contractor to submit invoices for payment including certified and signed delivery tickets showing the amount of fuel delivered into the aircraft (*id*.).

Security and Facility Access

6.  The contract's SOW, Section 4, SCOPE, provided:

> The Government will identify a point of contract (POC) at contract award that the Contractor shall coordinate with to work to arrange a potential secure area for refueling

3

vehicles, . . . to obtain required facility access at the exact site location, and to identify any airport/airfield permits that are required.

(*Id*. at 29)

7.  The contract's SOW, Section 13, SECURITY REQUIREMENTS, specified:

13.1.  The Contractor shall be responsible for security of all vehicles, personnel and aviation fuel being transported under this contract.  The Contractor shall provide its own security IAW all applicable GIRoA laws/regulations and Department of Defense/CENTCOM/U.S. Forces-Afghanistan (U.S. FOR-A)/Resolute Support, regulations, policies, and Fragmentary Orders (FRAGO). . . .

13.2.  Delivery Point Security Requirements:  Force protection requirements are in full effect at all times under this contract.  There may be waiting periods outside the gates of all delivery sites (AAF or SMW).  Security measures change according to perceived threat levels, and may irregularly affect wait times outside of installation entry points.

(*Id*. at 39-40)  TLS engaged the Afghanistan Ministry of the Interior National Public Protection Force for its security (compl. ¶ 26).

8.  The contract also included CENTCOM Joint Theater Support Contracting Command (C-JTSCC) clause 5152.225-5916, MANDATORY ELIGIBILITY FOR INSTALLATION ACCESS (OCT 2015).  That clause provides, in part:

(a)  U.S. and Coalition Commanders possess inherent authority to maintain law and order, provide security, and impose discipline necessary to protect the inhabitants of U.S. and/or Coalition installations, U.S. and Coalition personnel operating outside of installations, and U.S. or Coalition-funded developmental projects in Afghanistan. This authority allows commanders to administratively and physically control access to installations and/or project sites . . . .  A commander's inherent force protection (FP) authority is independent of an agency's contracting authority, and it may not be superseded by any contractual term or provision.

4

(R4, tab 1 at 25)

9. The United States Central Command established the overall force protection requirements in Afghanistan (app. supp. R4, tab 107 at 64). The force protection requirements concerned security at individual locations including vehicle and personnel searches (*id*. at 62-63). Force protection requirements may also include enforcing waiting periods for access to the facilities (*id*. at 70-71). Contractors had to comply with those requirements (*id*. at 62). Commanders at the individual facilities could make changes to the force protection posture based on individual threats (*id*. at 65).

10. The contract's SOW Section 20.1., Services, provides:

> The Government will provide POC [Point of Contact] information for each of the locations identified in Paragraph 9, as well as POCs for each fuel delivery Contractor with which the Contractor shall coordinate quality assurance testing as described in Paragraph 6.2. The KO [Contracting Officer] and COR [Contracting Officer Representative] will also coordinate and assist the Contractor in the event of any denial of access to ANDSF facilities that interferes with contract performance.

(R4, tab 1 at 41)

Risk of Loss

11. The contract's SOW, Section 14, Risk of Loss, states:

> Risk of loss or damage shall remain with the Contractor, until, and will pass to U.S. Government upon, delivery of the aviation turbine fuel products into AAF or SMW aircraft.
>
> 14.1. The Contractor bears all risk and responsibility for loss or damage to equipment and personal injury or death of its employees, agents or subcontractors, or any member of the public, if such damage, personal injury or death arises from or relates to any performance under this contract.
>
> 14.2. The Contractor is solely responsible for obtaining adequate insurance to cover the risks discussed herein.

5

14.3. The U.S. Government will not reimburse the Contractor for claims stemming from loss or damage to product or equipment or personal injury or death of employees, agents, or subcontractors, or any member of the public.

(*Id*. at 40)

12. The contract included C-JTSCC clause 5152.225-5915, CONTRACTOR ACCOUNTABILITY AND PERSONNEL RECOVERY (JUN 2014). The clause states, in part:

Contract performance may require work in dangerous or austere conditions. Except as otherwise provided in the contract, the contractor accepts the risks associated with required contract performance in such operations.

(*Id*. at 24)

Contract Modification

13. The Army modified the contracts in June and July 2020 to implement minimum fuel reserve and minimum bowser quantity requirement changes, provide associated firm-fixed price changes, and incorporate an updated narrative to the SOW implementing the minimum fuel reserve and minimum bowser quantity requirements (R4, tabs 25-30).

United States Withdrawal from Afghanistan

14. The United States and the Taliban, signed the "Agreement for Bringing Peace to Afghanistan" in Doha, Qatar on February 29, 2020 ("Doha Agreement", *available* at https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-Bringing-Peace-to-Afghanistan-02.29.20.pdf).

15. On April 14, 2021, pursuant to the Doha Agreement, President Joseph R. Biden announced that all remaining United States military personnel would leave Afghanistan by September 11, 2021, which was later changed to August 31, 2021. *See* Special Inspector General for Afghanistan Reconstruction Quarterly Report to the United States Congress, October 30, 2021, (SIGAR Report) at 3 *available* at https://www.sigar.mil/pdf/quarterlyreports/2021-10-30qr.pdf.

16. The U.S. Forces-Afghanistan (USFOR-A) formally began the final phase of the withdrawal from Afghanistan on May 1, 2021 (*id*. at 68). TLS provided a series of Serious Incident Reports (SIR) between August 6 and August 18, 2021, regarding

the Taliban takeover of various sites and lost fuel and assets (*See, e.g.*, R4, tab 31). These reports were informational in nature and did not request any government response (*id.*).

17. On August 6, 2021, TLS informed the Army that they were exploring airlifting fuel into Shorab since the Taliban controlled all the road routes (app. supp. R4, tab 16 at 2). The next day, the Army's contracting officer representative asked TLS whether they could airlift fuel into Shorab since fuel was becoming an urgent need (*id.* at 1). The record does not indicate whether TLS airlifted fuel into Shorab, but apparently, TLS moved a fuel bowser by air from Kabul to Maimana on August 11, 2021, at the Army's request (app. supp. R4, tab 129 at 5).

18. On August 15, 2021, Taliban fighters occupied the presidential palace in Kabul and the GIRoA collapsed (SIGAR Report at 72). The Taliban took over most of Afghanistan and the ANDSF facilities relevant to these contracts within days (compl. ¶ 4). The Taliban also confiscated all of TLS' fuel and transportation, storage and delivery equipment and assets at all the relevant facilities and TLS's regional fuel terminals (*id.*).

Contract Termination and Appeal

19. The government terminated the contracts for convenience on September 2, 2021, with an effective date of September 7, 2021 (R4, tabs 8a, 12).[2]

20. On December 28, 2021, TLS provided the government with a termination settlement proposal (TSP) under FAR 52.212-4(l), the contract's commercial items termination for convenience clause (R4, tab 13a). The TSP requested a payment of $14,189,284.95 consisting of $1,264,767.77 for "On-Base Fuel," $4,918,980 for "Terminal Fuel," $6,980,600 for "Equipment," $980,000 for "Office," $26,126 for "Costs of Preparing TSP" and $44,937.18 for "Improperly Rejected Invoices" (*id.* at 20).[3] TLS provided a certification pursuant to DFASRS clause 252.243-7002, REQUESTS FOR EQUITABLE ADJUSTMENT, with its TSP (*id.* at 20-21).

---

[2] The contracting officer's termination notice stated it was issued in accordance with FAR Part 49 and FAR 52.249-2. The contracts, however, did not contain those provisions. Rather, the contracts contained FAR 52.212-4, the terms and conditions for commercial item contracts. The parties agree the FAR 52.212-4(l) commercial items termination provisions control the resolution of TLS's termination costs (app. resp. at 21-22; gov't reply at 34-35).

[3] Appellant apparently did not include in its claim calculation the costs for preparing the TSP. The total claimed TSP amount including the costs for preparing the TSP calculates to $14,215,410.95 and not $14,189,284.95.

21. On February 15, 2022, the contracting officer issued a contracting officer's final decision (COFD) responding to TLS' TSP and certified claim (R4, tab 22a). The contracting officer determined TLS was entitled to be paid for its unpaid invoices in the amount of $2,201,966.56; disputed invoices in the amount of $44,937.18; and TSP preparation costs in the amount of $26,126 (*id*. at 4-5).[4] The contracting officer further determined TLS was not entitled to be paid for the undelivered on-base fuel, fuel located at the terminals and the lost equipment since they belonged to TLS and not the United States at the time of their loss (*id*. at 5).

22. On May 16, 2022, TLS appealed the contracting officer's COFD to the Board. Appellant's complaint lists five counts: (I) breach of contract for failure to pay for delivered fuel; (II) breach of contract for failure to provide adequate security and facility access; (III) breach of implied duties of good faith and fair dealing; (IV) breach of contract for failure to pay for work completed and reasonable charges upon termination for convenience; and (V) increased costs resulting from a constructive change (compl. ¶¶ 74-101).

23. On April 3, 2023, the government filed its motion for summary judgment requesting the Board deny appellant's complaint and request a stay of the Board proceedings (gov't mot. at 1-2). On April 24, 2023, the Board granted the parties' joint request to suspend discovery for 90-days. On May 8, 2023, the Board granted the parties' joint proposed schedule for briefing and limited discovery on the government's motion. On July 5, August 7 and October 16, 2023, the Board granted the parties' additional joint requests to further extend the briefing and limited discovery to allow appellant time to conduct discovery to respond to the motion. On October 23, 2023, appellant filed its response to the government's summary judgment motion and filed a cross-motion for partial summary judgment. The parties filed additional replies and sur-replies.

DECISION

I. <u>The Parties' Contentions</u>

TLS claims it is entitled to its costs for the loss of fuel, delivery equipment, and other assets at various locations throughout Afghanistan due to the collapse of the GIRoA and takeover by the Taliban because the government breached the contract by failing to pay for the delivered fuel (compl. ¶¶ 74-79), provide adequate security and facility access (compl. ¶¶ 80-84) and breached its covenant of good faith and fair dealing (compl. ¶¶ 85-90). TLS also claims the government constructively changed

---

[4] The record is unclear as to whether the government paid TLS for these allowed amounts since TLS apparently had trouble establishing a non-Afghan bank account (R4, tab 24).

the contract (compl. ¶¶ 96-101).  Finally, appellant asserts the government failed to pay for the completed work and reasonable charges resulting from the termination for convenience (compl. ¶¶ 91-95).

The government contends the Board should grant its motion for summary judgment because the undisputed facts show it did not breach the contract and did not constructively change the contract (gov't mot. at 7-8).  Moreover, the government asserts the Board should grant its request for summary judgment based upon its affirmative defenses of sovereign acts, third-party action, and assumption of risk (*id.* at 2).

In its response, TLS first opposes the government's motion asserting there are many disputed issues of material facts that preclude entry of summary judgment (app. resp. at 2).  TLS next claims the government's motion should be denied because it has not had the opportunity to conduct full discovery (*id*. at 3).  Finally, TLS asserts its own entitlement as a matter of law to be paid for the fuel stored at the various facilities and terminals and for its equipment under the commercial termination for convenience clause since the contract included a minimum fuel requirement (*id*.).  The Army replies that it is not required to pay appellant for the lost fuel and equipment under the commercial termination for convenience clause since the Taliban took the fuel and equipment before the termination for convenience occurred and the contract placed the risk of loss on TLS (gov't reply at 34-35).

We first address issues raised by the government's motion for summary judgment and then appellant's motion for partial summary judgment on the termination for convenience costs.

II.  Summary Judgment Standard

"Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003); FED. R. CIV. P. 56(a).  A material fact is one that makes a difference in the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)).

While the movant must demonstrate there is no "genuine issue for trial," the nonmovant must "make a showing sufficient to establish the existence of an element essential to [its] case and on which [it] will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A non-movant seeking to defeat summary

9

judgment by suggesting conflicting facts, "must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v.* Cities Serv. Co., 391 U.S. 253, 288 (1968)). "[M]ere denials or conclusory statements are insufficient." *SRI Int'l v. Matushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984)). Finally, the evidence must be viewed in the light most favorable to the party opposing the motion. *Crown Operations Int'l, Ltd. V. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002).

III. Appellant Has Not Shown A Need For Additional Discovery

Appellant first contends the Board should deny the Army's summary judgment motion because the Army failed to provide information and/or documents responsive to appellant's discovery requests that appellant needs to respond to the motion (app. resp. at 14-16). Appellant correctly notes the Federal Rules permit the Board to deny a motion for summary judgment if the non-movant has not had the opportunity to conduct necessary discovery. *See* Board Rule 7(c); Fed. R. Civ. P. 56(d); *Dunkin Donuts of America, Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed. Cir. 1988). The rule, however, specifically states the nonmovant must show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition . . . ." Fed. R. Civ. P. 56(d). "Thus, a party opposing summary judgment cannot obtain the protection of Rule 56(d) 'by simply stating that discovery is incomplete.'" *Odyssey International, Inc.*, ASBCA Nos. 62062, 62279, 21-1 BCA ¶ 37,902 at 184,071 quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1308 (10th Cir. 2007). Rather, the party opposing the motion must "state with specificity how the additional material will rebut the summary judgment motion." *Libertarian Party of N.M.*, 506 F.3d 1308-09 citing *Ben Ezra, Weinstein & Co. v. Am. Online Inc.*, 206 F.3d 980, 987 (10th Cir. 2000). Here, appellant has provided no such support.

Rather, appellant claims the Army failed to provide it with correspondence within the Army and between the Army and ANDSF about "security of the facilities, changes in force protection requirements, threats to facilities, need for continued delivery of fuel to those facilities as well as what happened to the fuel after TLS' employees were removed from the facilities" (app. resp. at 15-16). The government replies those requested documents are "irrelevant for the purposes of the motion for summary judgment" (gov't reply at 34). We agree with the government. Any communications between the Army and GIRoA, or within the Army, will not change the plain unambiguous contract language or impact the government's affirmative defenses. Appellant has failed to show how the additional requested discovery will lead to facts necessary for its defense of the government's motion.

10

IV. The Government Did Not Beach the Contract

    A. Delivered Fuel

To prevail on a breach of contract claim, TLS must show: (1) a valid contract between the parties; (2) a government obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by that breach. *Trident Engineering & Procurement, P.C.*, ASBCA Nos. 60541, 62144, 23-1 BCA ¶ 38,351 at 186,235; *Lockheed Martin Integrated Sys., Inc.*, ASBCA Nos. 59508, 59509, 17-1 BCA ¶ 36,597 at 178,284 citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

In Count I of its complaint, TLS alleges the government breached the contracts by failing to pay for what it refers to as "delivered" fuel (compl. ¶¶ 74-79). This is somewhat confusing because in the complaint's prayer for relief, TLS seeks payment only for pre-positioned fuel stored at the ANDSF facilities and regional terminals (compl. prayer for relief). TLS apparently seeks to recharacterize this fuel as delivered fuel despite lacking any evidence of actual delivery.

The government responds it did not breach the contracts because it paid appellant for all the fuel delivered under the contracts including $2,201,966 for unpaid verified invoices and $44,937 for rejected invoices (gov't mot. at 18).[5] The government admits it did not pay TLS for the on-base and terminal fuel because it had no duty to pay TLS for those items (*id.*). Moreover, the government contends it has no responsibility to pay for those items since their loss resulted from third party actions (*id.* at 19).

    1. The Contracts Defined "Delivery" To Be Fuel Delivered Into the Aircraft

The contracts incorporated by reference FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JAN 2017) (SOF ¶ 3). The FAR 52.212-4(i) payment provisions required the government to make payment to TLS for items that were "accepted" and "delivered" to the destination set forth in the contract. The contracts specified delivery and acceptance occurred when TLS delivered the fuel into the aircraft and the ANDSF delivery activity signed off on the delivery ticket indicating the actual delivered fuel amount (SOF ¶ 4). Based on the plain contract

---

[5] As previously noted, the contracting officer determined these were allowable costs in his final decision, but the record is unclear whether the government has actually paid TLS for these allowed costs (SOF ¶ 21).

language, fuel that is pre-positioned or stored in a regional terminal has not been delivered and accepted.[6]

TLS does not dispute the government paid it for the fuel delivered into the designated aircraft but rather contends all the fuel delivered to the ANDSF aircraft after the Taliban takeover and all the fuel maintained at the facilities and regional terminals should be "deemed delivered and accepted" (compl. ¶ 45). TLS maintains it became impossible for it to obtain the confirmation of acceptance and fuel delivery into the ANDSF aircraft after the Taliban takeover (*id*.). Moreover, TLS contends all the fuel should be determined to be delivered and accepted since the contract required TLS to preposition the fuel to maintain an effective supply chain thereby ensuring an uninterrupted fuel supply (*id*). In the alternative, TLS claims delivery of the fuel was completed and accepted by ANDSF the moment the Taliban took over the facilities and denied TLS access (compl. ¶ 46).

Appellant has the burden of proof to prove government acceptance. *Chloeta Fire, LLC*, ASBCA No. 59211, 15-1 BCA ¶ 36,167 at 176,485. Here, appellant has presented no evidence that the Afghan government accepted the fuel delivered into any aircraft after the Taliban takeover or any prepositioned fuel. The government had no obligation to pay TLS for undelivered fuel.

The parties do not dispute that the Taliban confiscated the undelivered fuel when it took over the facilities (SOF ¶ 18). The Federal Circuit has long held "absent fault or negligence or unqualified warranty of the part of its representatives, the Government is not liable for damages resulting from the action of third parties." *Oman-Fischbach Int'l (JV) v. Pirie*, 276 F.3d 1380, 1385 (Fed. Cir. 2002); s*ee also Zafer Taahhut Insaat ve Ticaret A.S. v. United States,* 833 F.3d 1356, 1364 (Fed. Cir. 2016) (addressing Pakistan's closure of its border with Afghanistan, delaying appellant's delivery of materials, and holding "the U.S. government is not responsible for the sovereign acts of a foreign nation"); *Omran, Inc*., ASBCA No. 63414, 24-1 BCA ¶ 38,572 at 187,477 (government not liable for contractor's loss of construction equipment since the Taliban's seizure of that equipment was not foreseeable); *Piril Insaat Tic. Bilgisayar Elek. Buro Donanim Ltd. Sti.*, ASBCA No. 55605, 08-2 BCA ¶ 34,010 at 168,187 (government not liable for truck damages since the hostile rifle fire that damaged the truck was not an act of the government). Here, the Taliban, a third-party, took TLS's undelivered fuel and equipment. The government is not responsible for the Taliban's actions.

---

[6] Similarly, the contracts required TLS to deliver the fuel on "a Free on Board (FOB) Destination Basis (SOF ¶ 2). FAR 2.101 provides, "*F.o.b. destination* means free on board at destination: i.e., the seller or consignor delivers the goods on seller's or consignor's conveyance at destination." Under the contracts, the delivery destination was the aircraft (SOF ¶ 2).

2. The Contracts Allocated the Risk of Loss to TLS

The commercial items clause further provided:

> (j) *Risk of loss*. Unless the contract specifically provides
> otherwise, risk of loss or damage to the supplies provided
> under this contract shall remain with the Contractor until,
> and shall pass to the Government upon: . . .
>
> (2) Delivery of the supplies to the Government at the
> destination specified in the contract, if transportation is
> f.o.b. destination.

FAR 52.212-4(j)(2)

Here, the contract specified fuel delivery occurred when TLS pumped the fuel into the aircraft (SOF ¶ 2). Accordingly, FAR 52.212-4(j)(2) placed the risk of loss on appellant until it delivered the fuel. *See KAL M.E.I. Manufacturing & Trade Ltd.*, ASBCA Nos. 44367, 45531, 45532, 94-1 BCA ¶ 26,582 at 132,258 (risk of loss remained with the contractor until delivery of the supplies to the government at the destination on a contract with a f.o.b. destination clause); *Donaldson Enterprises, Inc.*, ASBCA No. 57927, 13-1 BCA ¶ 35,368 at 173,562 (finding FAR 52.212-4(j)(2) expressly placed the risk of loss on the contractor up until the time the bailed rock was redelivered to the government).

Similarly, the contract's SOW also clearly specified the risk of loss would remain with the contractor until acceptance. SOW Section 6.14, Acceptance, stated that "[u]ntil acceptance, risk of loss or damage shall remain with the Contractor" (SOF ¶ 4). In addition, SOW Section 14, Risk of Loss, provided, "[r]isk of loss or damage shall remain with the Contractor, until, and will pass to U.S. Government upon, delivery of the aviation turbine fuel products into AAF or SMW aircraft" (SOF ¶ 11).

TLS contends these contractual risk of loss provisions do not apply in this case because they are limited to those losses occurring during contract performance, "e.g., from issues involving TLS' transportation, storage or handling of the fuel" (app. resp. at 18). TLS argues the parties intended the risk of loss provisions "to make sure that TLS took the necessary measures to get fuel from its origins to the relevant facilities and terminals to prevent Army paying for fuel damaged or pilfered along the way to the relevant facilities" (*id.*). TLS points to SOW Section 14.1 to support its contention (*id.*).

SOW Section 14.1 provides TLS would bear "all risk and responsibility for loss or damage to equipment and personal injury or death . . . if such damage, personal injury or death arises from or relates to any performance under this contract" (SOF ¶ 11). TLS

13

maintains the fuel and equipment losses in this case did not occur during contract performance but rather from their seizure by the Taliban (app. resp. at 18). TLS's interpretation of this contract loss provision is not supported by the contract's plain language.

SOW Section 14.1 addresses the loss or damage to equipment and personal injury or death but not loss of fuel (SOF ¶ 11). When read as a whole, Section 14 clearly places the risk of loss of fuel on the contractor until delivery. *McAbee Construction, Inc. v. United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996) (contract must be read as a whole to harmonize and give meaning to all parts). The initial language in SOW Section 14 states, "[r]isk of loss. . . shall remain with the Contractor, until . . . delivery of the aviation turbine fuel products into AAF or SMW aircraft" (SOF ¶ 11). SOW Section 14.2 places the responsibility upon the contractor to obtain adequate insurance to cover the risk of loss (*id*.). Further, SOW Section 14.3 states that the United States will not pay the contractor for claims stemming from loss or damage to product or equipment (*id*.).

Finally, the contracts' SOW specifically notified TLS that it may be required to perform the contract "in dangerous or austere conditions" and that it was accepting "the risks associated with the required contract performance in such operations" (SOF ¶ 12). TLS had clear notice that it was performing the contract in a dangerous environment that could result in the loss of both fuel and equipment due to hostile action. TLS accepted that risk upon contract award. *Omran, Inc*., 24-1 BCA ¶ 38,572 at 187,477 (contractor accepted potential loss of its equipment and materials to the Taliban at contract award).

TLS has failed to present sufficient evidence upon which a reasonable factfinder could find that there are material facts in dispute that the government breached the contract by failing to pay TLS for fuel delivered to aircraft after the Taliban takeover, the pre-positioned fuel stored at the applicable facilities and the fuel held in the regional terminals. The government is entitled to summary judgment on this issue.

B. Security and Access

In Count II of its complaint, TLS alleges the government breached the contract by failing to provide adequate security and facility access (compl. ¶¶ 80-84).

1. The Government Had No Contractual Duty To Provide Security

TLS contends the government breached its duty of providing a secure area when it allowed the Taliban to take over the facilities and equipment (compl. ¶¶ 81-82).

14

Appellant first asserts a material factual dispute exists concerning the Army's obligation to provide security (app. resp. at 2).[7]  Appellant, however, does not cite to any specific material disputed facts but largely relies upon legal arguments interpreting the various contractual provisions.  The interpretation of a government contract is a question of law not fact.  *Triple Canopy, Inc. v. Sec'y of Air Force*, 14 F.4th 1332, 1338 (Fed. Cir. 2021).

The contracts' SOW Section 13.1, SECURITY REQUIREMENTS, placed on TLS the responsibility "for security of all vehicles, personnel and aviation fuel being transported under this contract" (SOF ¶ 7).  That provision further required TLS to provide its own security in accordance with all applicable GIRoA and United States laws, regulations, and orders (*id.*).  TLS engaged the Afghanistan Ministry of the Interior National Public Protection Force for its security (*id.*).

TLS contends these security requirements placed the security responsibility upon it only during the transportation of the fuel to the relevant facilities (app. resp. at 5).  TLS claims the facilities were the delivery point (*id.*).  Once the fuel arrived at the facilities, TLS maintains the security obligation passed to the government (*id.*).  TLS points to SOW Section 13.2 in support of this contention (*id.*).  That provision, entitled "Delivery Point Security," indicated force protection requirements were in effect under the contract and there could be waiting periods outside the facility gates (SOF ¶ 7.).  TLS contends that since the Army established the overall force protection requirements, the Army warranted the facilities would be a secure area (app. resp. at 5).  TLS misreads the security provisions.

The contracts specify the contractual delivery point is delivery of the fuel into the aircraft and not delivery to the facilities (SOF ¶ 2).  As previously discussed, TLS remained the responsible party until it delivered the fuel into the aircraft.  Likewise, TLS's transportation obligations continued until it physically delivered the fuel into the aircraft.

SOW Section 13.2 does not alter TLS's contractual responsibilities.  That provision simply states force protection requirements were in effect.  TLS correctly notes the Army established the overall force protection requirements in Afghanistan (SOF ¶ 9).  The force protection requirements included setting out the procedures for entering and exiting facilities (*id.*).  Local commanders at individual facilities could modify the force protection posture based upon individual threats at their locations

---

[7] Confusingly, appellant in the next sentence contends the "[u]ndisputed facts prove" the army had a contractual obligation "to provide adequate security to TLS and its personal and equipment at the facilities" (app. resp. at 2).

15

(*id*.). Contrary to TLS' conclusion, those requirements did not warrant that the United States guaranteed the security for any facility.

TLS also claims the government breached its contractual security obligations by failing to provide adequate information and warning about the Taliban takeover (app. resp. at 6). TLS contends SOW provision 13.2 imposed upon the Army a requirement to notify it of imminent threats (*id*.). TLS claims it could have taken action to mitigate its damages if the government had notified it of the Taliban threat (*id*.). The government correctly notes this provision contains no such explicit or implicit notification requirement (gov't reply at 28).

The contract terms clearly placed the security responsibility upon TLS and not the government. We conclude the government did not breach the contract by failing to provide adequate security because no such contractual duty existed.

## 2. The Government Had No Contractual Duty To Provide Access

TLS also contends the government breached its contractual duty of providing it access to the relevant facilities (compl. ¶ 81). Appellant again first contends a material factual dispute exists concerning the Army's failure to provide TLS access but does not cite to any specific disputed facts in the record (app. resp. at 6-7). Appellant instead asserts the contract's SOW sections 4 and 20.1 placed an obligation upon the government to provide TLS access to the facilities (*id*. at 6). Similar to the security question, whether the contracts required the government to provide TLS access to the facilities is a legal question dependent upon the contract terms.

The contracts' SOW Section 4 required the government to identify a contact person for TLS to coordinate with to, among other things, obtain the required facility access (SOF ¶ 6). That provision did not guarantee facility access. Similarly, Section 20.1 indicated the government would coordinate and assist TLS in the event of any access denial to the facilities that interfered with contract performance (SOF ¶ 10). This section likewise did not guarantee access.

The contracts also included C-JTSCC 5152.225-5916, MANDATORY ELIGIBILITY FOR INSTALLATION ACCESS (OCT 2015) (SOF ¶ 8). That clause specifically notified TLS that the installation commander had the inherent authority to control installation access (*id*.). The clause further notified TLS that the commander's authority was independent from the government's contractual authority (*id*.). "A determination of installation access is a matter of inherent command authority and is not at the discretion of the contracting officer or this Board." *Sang Kash Company*, ASBCA No. 60532, 19-1 BCA ¶ 37,373 at 181,703 (refusing to question a military commander's revocation of base access). The installation commander's decisions to

16

limit TLS' employees' access to some of the facilities did not result in a government contract breach.

### 3. Sovereign Acts Defense

Even if the government had breached a contractual obligation to provide security or access to the facilities, the government correctly notes the sovereign acts defense would prevent any recovery (gov't mot. at 8-10). "The sovereign acts doctrine provides that 'the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.'" *Conner Bros. Constr. Co. v. Geren*, 550 F.3d 1368, 1371 (Fed. Cir. 2008) (quoting *Horowitz v. United States*, 267 U.S. 458, 461 (1925). The United States' withdrawal of its troops from Afghanistan made it impossible for the government to meet any contractual obligation to provide TLS security and access to the ANDSF facilities. *Casitas Municipal Water Dist. v. United States*, 543 F.3d 1276, 1287 (Fed. Cir. 2008) (The government is excused from performance under the sovereign acts defense when the sovereign act renders the government's performance impossible.) As such, the sovereign acts defense would excuse the government from any contractual breach if such a breach existed.

In this case, appellant does not dispute the United States decision to enter into the Doha Agreement with the Taliban and its decision to withdraw troops from Afghanistan were sovereign acts (app. resp. at 16). Appellant contends, however, that the Army's failure to provide security or TLS employee's access to the facilities both were a breach of the Army's express contractual obligations and not subject to the sovereign acts defense (*id*. at 16-17). As discussed above, we conclude the Army had no contractual obligation to provide security or facility access to appellant. As such, application of the sovereign acts doctrine is not necessary since it requires that "the government acting as a contractor must have breached the contract." *StructSure Projects, Inc.*, ASBCA No. 62927, 23-1 BCA ¶ 38,416 at 186,680.

### C. Duty of Good Faith and Fair Dealing

In Count III of its complaint, TLS alleges the government breached its implied duty of good faith and fair dealing (compl. ¶¶ 85-90). The doctrine of good faith and fair dealing prohibits "interference with or failure to cooperate in the other party's performance." *Labatte v. United States*, 899 F.3d 1373, 1379 (Fed. Cir. 2018) (quoting Restatement (Second) of Contracts § 205 cmt. d (1981)). Pursuant to this implicit duty, each party's obligations "include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Metcalf Construction Company, Inc.*, 742 F.3d 984 at 991 (Fed. Cir. 2014) (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). The duty is "keyed to the obligations and opportunities

17

established in the contract." *Lakeshore Engineering Services, Inc. v. United States*, 748 F.3d 1341, 1349 (Fed. Cir. 2014). *See also Metcalf*, 742 F.3d at 991-92 (explaining the need to consider the contract's allocation of risks and benefits in considering a claim of breach of the duty of good faith and fair dealing). The implied duty of good faith and fair dealing does not "expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc., v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010).

Appellant contends the government breached its duty of good faith and fair dealing by failing to provide it with information on the deteriorating security situation in Afghanistan and by its failure to provide direction in response to the various submitted SIRs (compl. ¶ 87). Appellant also contends the government breached its duty by failing to cooperate with TLS in safeguarding the fuel (compl. ¶ 88). Appellant alleges these failures prevented TLS from taking the necessary actions to mitigate its losses (compl. ¶ 87). In addition, TLS asserts the Board should deny the government's motion since a material factual dispute exists concerning the Army's failure to meet its duty of good faith and fair dealing under the contracts (app. resp. at 11).

In its summary judgment motion, the government argues appellant cannot establish any facts to support a breach of the duty of good faith and fair dealing (gov't mot. at 19). The government contends it had no contractual duty to notify TLS of the deteriorating security situation and respond to TLS' SIRs (*id.* at 20-21). The government points out the contracts did not require TLS to submit the SIRs, and TLS submitted those reports solely for informational purposes to notify the government when certain facilities were attacked and captured by the Taliban (*id.* at 20-22). The reports did not request the government take any actions (SOF ¶ 16). The government also contends TLS has provided no evidence indicating the government intentionally withheld security information from TLS that hindered its contract performance (gov't mot. at 21).

We have previously held "[w]here the failure to take some positive action is alleged as a breach of the duty of cooperation, it must be shown that the action was necessary for performance of the contract, and the Government unreasonably failed to take the action." *Envtl. Safety Consultants, Inc.*, ASBCA No. 47498, 00-1 BCA ¶ 30,826 at 152,145. TLS alleges the government failed to notify it of the deteriorating security situation in Afghanistan and failed to respond to the SIRs. Those actions, however, even if true, did not impact TLS' ability to perform the contract. TLS appears to have submitted the SIRs for purely informational purposes to tell the government which facilities had fallen to the Taliban and the amount of lost fuel and equipment (SOF ¶ 16). The SIRs did not request any government action (*id.*).

18

Moreover, the implied duty of good faith and fair dealing does not make the government responsible for third-party actions. *Olympus Corp. v. United States*, 98 F.3d 1314, 1318 (Fed. Cir. 1996) ("While interference by the government with a contractor's access to the work site may constitute a breach of the government's duty to cooperate, the government is not responsible for third-party actions such as labor strikes that delay a contractor's performance, absent a specific contractual provision.") Here, the Taliban's actions, and not any action or inaction by the government, prevented TLS from performing the contracts.

When the government is accused of breaching the duty of good faith and fair dealing, the Board will examine the reasonableness of the government's actions, considering all the circumstances. *SIA Construction, Inc.*, ASBCA No. 57693, 14-1 BCA ¶ 35,762 at 174,986. Ordinarily, issues requiring a determination of whether a parties' actions were reasonable cannot be disposed of by summary judgment (*id.*). In this case, however, appellant has identified no material facts indicating the government's actions or inactions prevented TLS from performing its contractual duties. *See Grow Life General Trading, LLC*, ASBCA Nos. 60398, 60467, 60887, 19-1 BCA ¶ 37,361 at 181,676 (An allegation the government breached its implied duty of good faith and fair dealing lacked merit because there was no evidence the government prevented the contractor from performing its duties). Under these circumstances, we conclude the government's actions were reasonable.

As previously discussed, the contract itself allocated the risk of operating in a hostile environment to TLS. Whether the government failed to provide TLS with direction in response to the SIRs or updates on the pending security situation did not frustrate TLS's ability to perform the contract. *See Bell/Heery, a Joint Venture v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014) (Court rejected contractor's good faith and fair dealing claim finding the contract allocated the risks attending to securing the required state permits to the contractor and the government did not affirmatively interfere with the contractor's dealings with the state agency); *JAAAT Technical Services, LLC.*, ASBCA No. 62373, 22-1 BCA ¶ 38,086 at 184,965 (rejecting contractors' breach of the duty of good faith and fair dealing claim since it would impose upon the government a duty inconsistent with the contract provisions). Accordingly, based on the record, the government is entitled to summary judgment on this issue.

V. Constructive Change

In addition to its contract breach claims, TLS contends in Count V of its complaint that the government constructively changed the contracts (compl. ¶¶ 96-101). Appellant alleges the Army constructively changed the contract when the government and ANDSF denied TLS access to the relevant facilities, and the government and/or ANDSF took control of TLS's facilities, fuel and equipment thereby abandoning the

19

contractual fuel delivery and acceptance procedures (compl. ¶ 99). Appellant also alleges the government constructively changed the contracts when it failed to secure the facilities, fuel, and equipment (compl. ¶ 100).

In its motion, the government contends appellant is not entitled to an equitable adjustment due to a constructive change because appellant did not perform any work beyond the contract requirements and the government did not order, expressly or impliedly, any additional work (gov't mot. at 23-24). In its response to the government's motion, appellant further suggests the government changed the contract by requiring fuel delivery by air on at least one occasion (app. resp. at 9).

To recover for a constructive change, a contractor must prove (1) it performed work beyond the contract requirements; and (2) the government expressly or impliedly ordered the additional work. *Bell/Heery,* 739 F.3d at 1335; *ANHAM FZCO, LLC*, ASBCA No. 58999, 20-1 BCA ¶ 37,745 at 183,186. The contracts required TLS to deliver fuel into the aircraft (SOF ¶ 2). Appellant first suggests material factual disputes exist with regards to the constructive change as to (1) whether the Army provided the necessary security and/or access to the facilities; (2) the Army's continued requirement for appellant to provide the fuel despite the deteriorating security situation; and (3) the Army's requirement for TLS to deliver fuel and equipment by air to some facilities (app. resp. at 8-9).

With regards to appellant's first two contentions, the government correctly points out that even if true, they would not constitute constructive changes because appellant performed no additional work beyond the contracts' requirements (gov't mot. at 23). Appellant admits that its claim amounts result from its total loss of the fuel reserves and equipment and assets used to transport, store, and deliver the fuel and not increased costs resulting from work performed beyond the contracts' requirements (compl. ¶ 36).

Appellant further suggests the Army somehow constructively changed the contracts' requirements when ANDSF changed the fuel delivery and acceptance procedures following the Taliban takeover (app. resp. at 10). It is well established that interference by a foreign government is not a constructive change. *Kellogg Brown & Root Servs.*, ASBCA No. 59385, 20-1 BCA ¶ 37,656 at 182,832. Moreover, to prevail on its constructive change claim, TLS must show an authorized government representative required or compelled it to perform work beyond the contracts' requirements. *Environmental Chemical Corporation*, ASBCA Nos. 59280, 60760, 22-1 BCA ¶ 38,166 at 185,361. Appellant has not identified any explicit or implicit government action that required it to perform work beyond the contracts' requirements.

20

Finally, appellant suggests that on at least one occasion, the government constructively changed the contracts' by requiring TLS to provide air transport to deliver fuel and equipment to some facilities (app. resp. at 9). Appellant cites to an email in which the Army contracting officer representative asks TLS whether they can do an air cargo lift since fuel is becoming an urgent need (SOF ¶ 17). While the record is unclear as to whether TLS airlifted any fuel into Shorab, the evidence suggests TLS moved another bowser by air allegedly at the Army's request (*id*.).

Even if the Army requested TLS move a fuel bowser by air, however, that request would not have been a constructive change to the contracts. The contracts required TLS to provide all the necessary transportation to deliver the fuel into the aircraft on a FOB destination basis (SOF ¶ 2). The contract did not specify how TLS should transport that fuel to the facilities. An Army request to TLS to deliver fuel by air to the facilities would not be a change to the contracts' requirements.

TLS did not perform work beyond the contracts' requirements. Moreover, we find no evidence that the government either expressly or impliedly ordered any additional work. Accordingly, the government is entitled to summary judgment on this issue.

## VI. Termination for Convenience Costs

TLS also filed a cross-motion for partial summary judgment claiming it is entitled to receive compensation as part of its termination for convenience settlement costs for its lost fuel reserves and equipment (app. resp. at 20-22).[8] TLS claims the contracts required it to maintain a fuel reserve and equipment at each of the specified facilities and at the regional terminals to ensure an uninterrupted fuel supply (*id*. at 20-21). TLS further alleges the government did not give it the opportunity to remove the fuel and equipment before the Taliban takeover (*id*. at 22). As such, TLS claims the fuel reserves and equipment at the facilities and regional terminals should be considered as part of its completed work under the contracts (*id*. at 21-22).

The government responds it is not responsible for paying appellant for any of its lost stored fuel or equipment costs as part of the termination settlement since the Taliban seized those items prior to the termination and appellant bore that risk of loss (gov't reply at 35). The government contends those losses resulted from the actions of a third-party and not the termination (*id*.).

The contracts incorporated the commercial termination clause at FAR 52.212-4(l) (SOF ¶ 3). Our previous decisions have analyzed this clause as providing for

---

[8] The Board notes the government has not filed a cross-motion for summary judgment on the termination for convenience issue.

reimbursement under two prongs:  the first prong being for the percentage of work performed prior to the termination notice and the second prong for costs resulting from the termination including settlement costs.  *See SWR, Inc*., ASBCA No. 56708, 15-1 BCA ¶ 35,832 at 175,223-24; *Zahra Rose Construction*, ASBCA No. 62732, 22-1 BCA ¶ 38,111 at 185,111.

Under the first prong, TLS is limited to recovering the price of the delivered fuel prior to the termination as the work performed under the contracts.  *See Hermes Consolidated, Inc., d/b/a Wyoming Refining Co*., ASBCA Nos. 52308, 52309, 02-1 BCA ¶ 31,767 at 156,899 (recovery limited to the price of fuel delivered plus "reasonable charges" under a fuel supply contract because the termination for convenience clause permitted the government to terminate any portion of the guaranteed minimum quantity and be responsible only for the price of delivered fuel); *ACLR, LLC v. United States*, 157 Fed. Cl. 324, 333 (2021) (prong one looks to the amount of payment the contractor is entitled to be paid under the terms of the contract).  Under the contracts, the government was responsible for paying TLS for delivered fuel (SOF ¶ 4).  The government paid TLS for that fuel (SOF ¶ 21).  As such, TLS summary judgment motion seeking a determination that its fuel reserves and equipment at the facilities and regional terminals be considered as part of its completed work under the contracts is denied.

The commercial termination for convenience clause, however, also provides recovery for any reasonable expenses resulting from the termination including costs incurred in preparing to perform the contracts.  *See SWR, Inc*., 15-1 BCA ¶ 35,832 at 175,227-28 (contractor entitled to recover a deposit for fabric structures made prior to the termination for convenience while preparing to perform the contract); *Zahra Rose Construction*, 22-1 BCA ¶ 38,111 at 185,111 (contractor entitled to recover its costs incurred in leasing fuel trucks in preparation for performing the contract).  As we explained in *SWR*, FAR 52.212-4(l) provides for the "recovery of those charges incurred that 'do not relate to work completed' but should be reimbursed to fairly compensate the contractor whose contract has been terminated." *SWR*, 15-1 BCA ¶ 35,832 at 175,223.  This principle is consistent with the overall purpose of a termination for convenience settlement which is to fairly compensate the contractor and to make the contractor whole for the costs incurred in connection with the terminated work.  *Id.* (citing *Nicon, Inc. v. United States*, 331 F.3d 878, 885 (Fed. Cir. 2003).  "A contractor is not supposed to suffer as the result of a termination for convenience of the Government, nor to underwrite the Government's decision to terminate." *Jacobs Engineering Group, Inc. v. United States*, 434 F.3d 1378. 1381 (Fed. Cir. 2006) (quoting *Kasler Electric Co*., DOT CAB 1425, 84-2 BCA ¶17,374 at 86,566-67).

The Army contends TLS is not entitled to any payment for the lost fuel reserves and equipment under the termination for convenience since the Taliban seized those

items shortly prior to the termination and TLS bore the risk of loss (gov't reply br. at 35).  TLS, however, incurred the costs to preposition the undelivered fuel and equipment in preparing to perform the contracts prior to the Taliban's seizure.  The contracts required TLS to maintain minimum fuel reserves and bowser quantities to ensure an uninterrupted fuel supply to meet the required fuel deliveries (SOF ¶¶ 2, 13).  TLS may be entitled to recover those costs under the commercial termination for convenience clause as costs reasonably incurred in preparing to perform the contracts.[9]  The existing record, however, is unclear as to whether TLS could have taken any actions to avoid the loss and thereby mitigate the costs. *Zahra Rose Construction*, 22-1 BCA ¶ 38,111 at 185,111 (avoidance of additional cost is a duty of a terminated contractor).  The record is also unclear as to whether TLS obtained the required insurance that may offset some of its claimed termination costs.  Accordingly, we conclude that the record needs to be further developed on this issue and thus, summary judgment is not appropriate at this time. *See Conquistador Dorado JV*, ASBCA No. 60042 *et al.*, 20-1 BCA ¶ 37,628 (summary judgment not appropriate when record needs further development).

TLS bears the burden of proving its recovery of the government's refusal to pay its claimed termination settlement costs. *SWR*, 15-1 BCA ¶ 35,832 at 175,229 (citing, *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987).  That proof should be of "sufficient certainty so that the determination of the amount of the damages will be more than mere speculation." *Lisbon Contractors, Inc.*, 828 F.2d at 767 (Fed. Cir. 1987).

---

[9] To be clear, we make no determination currently on TLS's claim for termination costs under FAR 52.212-4(l) prong two.

## CONCLUSION

For the reasons set forth above, the government's motion for summary judgment on appellant's breach of contract contentions (Counts I, II, III) is granted. In addition, the government's motion for summary judgment on appellant's constructive change allegation (Count V) is granted. Appellant's cross-motion for partial summary judgment on the termination for convenience costs (Count IV) is denied. Thus, this decision does not resolve the entire appeal as TLS' entitlement to additional termination settlement costs, if any, will be addressed in further proceedings.

Dated: August 12, 2024

ARTHUR M. TAYLOR
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

24

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63282, Appeal of Targe Logistic Services Company, rendered in conformance with the Board's Charter.

Dated:  August 12, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals